IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PROGRESSIVE MEDICAL CONSULTANTS, LLC, SHELBY MAINZER and JAIME FRAZIER<br><br>*Plaintiffs*<br><br>VS.<br><br>ICON SOLUTIONS, LLC, ICON LABS, LLC, ICON LABS 3, LLC, DAVID SCHULTZ, LLC, WILLIAM WESLEY LAMBARD, DAVID SCHULTZ, and ARON TIPTON<br><br>*Defendants* | CIVIL ACTION NO. 4:18-cv-1128 |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

PROGRESSIVE MEDICAL CONSULTANTS, LLC, SHELBY MAINZER and JAIME FRAZIER, (hereinafter "Plaintiffs"), file this *Original Complaint* (the "Complaint"), complaining of the acts or omissions of ICON SOLUTIONS, LLC, ICON LABS, LLC, ICON LABS 3, LLC, DAVID SCHULTZ, LLC, WILLIAM WESLEY LAMBARD, DAVID SCHULTZ, AND ARON TIPTON, (hereinafter "Defendants"), and respectfully show the Court as follows:

### I.    INTRODUCTION

1.    This is a lawsuit based on the dishonest business practices of all Defendants. Plaintiffs have been engaged in the medical sales business for years. Defendants are engaged in the distribution of surgical instruments, medical devices, medical supplies, and laboratory testing.

Plaintiffs entered into a contract with Defendants after Defendants recruited them to work as contract salespeople to promote their business and products to physicians. Plaintiffs' decision to enter the contracts was based on Defendants' representations about the division of revenue that Plaintiffs would later discover were false or misleading, and based on promises Defendants never intended to keep. In short, Defendants misrepresented the commissions and profits due to Plaintiffs, and used various techniques to conceal their siphoning of funds owed to Plaintiffs. Accordingly, Plaintiffs bring this suit against Defendants for breach of contract, fraud, money had and received, The Texas Theft Liability Act, unjust enrichment, and quantum meruit.

## II.   PARTIES

2.     Plaintiff Progressive Medical Consultants, LLC is a limited liability company organized under the laws of the State of Oklahoma.  Plaintiffs Shelby Mainzer and Jaime Frazier assigned all rights and obligation of the contract which is the subject of this lawsuit to Progressive Medical Consultants, LLC, an entity formed by Plaintiffs Mainzer and Frazier.

3.     Plaintiff Shelby Mainzer is an individual who resides in Fayetteville, Arkansas.

4.     Plaintiff Jaime Frazier is an individual who resides in Bentonville, Arkansas.

5.     Defendant Icon Solutions, LLC, is a limited liability company organized under the laws of the State of Texas, and may be served with process through its registered agent: Aron Tipton, 33138 Magnolia Circle, No. B1, Magnolia, Texas, 77354.

6.     Defendant Icon Labs, LLC is a limited liability company organized under the laws of the state of Texas, and may be served with process through its registered agent: Icon Partners, LLC, 33138 Magnolia Circle, No. B1, Magnolia, Texas, 77354.

7.      Defendant Icon Labs 3, LLC is a limited liability company organized under the laws of the state of Texas, and may be served with process through its registered agent: Aron Tipton, 33138 Magnolia Circle, No. B1, Magnolia, Texas, 77354.

8.      Defendant David Schultz, LLC is a limited liability company organized under the laws of the state of Texas, and may be served with process through its registered agent: David D. Schultz, 7231 Coronado Avenue, Dallas, TX 75214.

9.      William Wesley Lambard is an individual currently residing in Harris County, Texas, and at all times pertinent to the claims brought herein resided in Montgomery County, Texas.  Mr. Lambard may be served with process at 33138 Magnolia Circle, No. B1, Magnolia, Texas, 77354.

10.      David Schultz is an individual currently residing in Dallas County, Texas, and at all times pertinent to the claims brought herein resided in Dallas County, Texas. Mr. Schultz may be served with process at 7231 Coronado Avenue, Dallas, Texas 75214.

11.      Aron Tipton is an individual currently residing in Harris County, Texas and at all times pertinent to the claims brought herein resided in Montgomery County, Texas.  Mr. Tipton may be served with process at 33138 Magnolia Circle, No. B1, Magnolia, Texas, 77354.

### III.    JURISDICTION AND VENUE

12.      The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiff and Defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

13.      Venue is proper in this district and division under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

14.     All other jurisdiction requirements and conditions precedent to filing suit have been met.

## IV.     STATEMENT OF FACTS

15.     On November 14, 2013, Defendants William Wesley Lambard and Aron Tipton organized Icon Solutions, LLC, which is a business engaged in the distribution of surgical instruments, medical devices, medical supplies, and laboratory testing, including but not limited to, DNA testing, toxicology testing, and other blood testing.

16.     Approximately one year later, on October 14, 2014, Defendants William Wesley Lambard and Aron Tipton also organized Icon Labs 3, LLC for the purpose of distributing medical supplies and performing laboratory testing. Defendants planned to capitalize the business buy making a private offering of forty (40) shares to individual physicians at the rate of $3,000 per share, representing a 2.44% ownership interest for each share. Defendants recruited Plaintiffs Shelby Mainzer and Jamie Frazier as sales representatives to offer and sell the shares.

17.     Plaintiffs Shelby Mainzer and Jamie Frazier are salespersons engaged in the sales of surgical instruments, medical devices, medical supplies, pharmaceuticals, and laboratory testing. Both Plaintiffs Mainzer and Frazier have been involved in the medical and pharmaceutical sales business for many years, and have cultivated numerous personal contacts in the medical field, including physicians, the sole target of the products sold by Defendant.

18.     During initial discussions between the parties, Defendants Lambard and Tipton told Plaintiff Mainzer multiple times they would pay Mainzer a commission for each share sold, and would also pay Mainzer a percentage of net profits from physician referrals for lab testing. Lambard and Tipton established a commission structure to pay Plaintiff Mainzer a portion of future net profits from lab testing sales with two tiers: one for referrals from physicians invested in the

laboratory and another for referrals from non-invested physicians. Plaintiffs were satisfied with the proposal and agreed to enter a contract with Defendants once the business was operational.   In October 2014, Plaintiff Shelby Mainzer, by and through his limited liability company known as Platinum Rule Medical Consultants, LLC, entered into a sales agreement confirmed by email with Defendant Tipton.

19.     In June 2015, Plaintiff Shelby Mainzer, by and through his limited liability corporation known as Platinum Rule Medical Consultants, LLC, entered into an Exclusive Independent Distribution Agreement with Defendant Icon Solutions, LLC, and its subsidiaries, to sell and promote the services and products of Defendant (hereinafter referred to as "First Contract"). A copy of this contract is attached as Exhibit "A".

20.     Plaintiff Mainzer's compensation under the First Contract was to be as follows:

# **ICON** Commission Structure

## Anmio, Lab and Pharmacy

| Non Invested Physicians | Qualified Units/Samples |
|---|---|
| 30% | 1-250 |
| 35% | 251-750 |
| 40% | 751+ |

| Invested Physicians | Qualified Units/Samples |
|---|---|
| 10% | 1-250 |
| 12% | 251-750 |
| 15% | 751+ |

*Icon Labs & Icon Biologics does not accept any money from federal claims.

## Injection kits

| Sales Price | Commission |
|---|---|
| List Price- 10% off | 30% of final sale price |
| 11%-20% Discount off List Price | 25% of final sale price |
| 21%-30% Discount off List Price | 20% of final sale price |

*All commissions are paid off on Gross profit after collections

(Gross Profit = Revenue minus Cost of Goods)

**_Figure 1_**

21.     As Figure 1 reflects, under the terms of the contract, Plaintiffs' commissions were

calculated as a percentage of gross profit, where gross profit equaled revenue minus the cost of

goods.

22.     Plaintiff Shelby Mainzer hired Plaintiff Jaime Frazier as an independent contractor to help his company, Platinum Rule Medical Consultants, LLC, sell shares in Icon Labs 3, LLC and work with his company to build their physician client base.

23.     After working under the First Contract for some time, Plaintiffs noticed a series of odd and irregular discrepancies in the accounting of commissions due to them. Plaintiffs would later discover that Defendants Tipton, Lambard and Woodyard used various techniques to misrepresent the revenues and expenses to Plaintiffs, and skimmed profits for themselves.

24.     For example, Defendants grossly overstated the amounts tied to the cost of goods for laboratory services rendered. They deceived Plaintiffs and their shareholders that the cost of goods was around 30%, when in reality they were reflected as 17%, the Private Placement Memorandum ("PPM"), which was the promotional document used to recruit investors.

25.     As another example of the misleading business arrangements, around April of 2015 Defendant Lambard hired Defendant David Schultz to be a "salary employee" for Icon Solutions. Defendant David Schultz maintained that he was a salary employee and never received compensation from any of Plantiffs Mainzer and Frazier's accounts.  However, Plaintiffs Mainzer and Frazier would later discover documentary evidence that David Schultz did in fact receive compensation from Plaintiffs Mainzer's and Frazier's accounts.

26.     Defendants misrepresentations took time for Plaintiffs to fully discover and appreciate, however Plaintiffs began to notice a series of accounting discrepancies and misleading statements about Icon Labs 3, LLC's financial reports. Plaintiffs Frazier and Mainzer made various attempts to speak to Tipton, Lambard, Woodyard, and Schultz about these issues, and even discussed using another management company due to the lack of transparency and reporting. However, whenever Plaintiffs confronted any of the individual Defendants, they would often

become defensive, and blame the accounting discrepancies on whichever Defendant was not present for the conversation.

27.     In response to Plaintiffs inquiries, Defendants promised Plaintiffs transparency, billing reports, and timely commissions if Plaintiffs would continue to use their services. In light of this commitment, Plaintiffs continued their sales efforts on behalf of Defendants.  But around August 2015, both Plaintiffs and the Defendant's shareholders asked for reporting from Icon Solutions for referred samples. Consistent with past conduct, Defendants refused to provide any details.

28.     On October 23, 2015, Pam Kelly, a former medical biller and shareholder, confided in Plaintiff Shelby Mainzer that Icon Labs 3, LLC's distributions were not making sense. Pam Kelly asked Plaintiffs for an Accounts Receivable Report ("AR Report") of all samples processed and billed. Defendants Lambard, Woodyard and Schultz refused to provide Mainzer any AR Reports and acted as if Pam Kelly did not know what she was talking about, despite her background in medical billing.

29.     Indeed, many of Defendants' claims about Icon Labs 3, LLC's financials did not make sense. For example, around January of 2015, Lambard and Woodyard began claiming that the Icon Labs 3, LLC had overpaid shareholder doctors upwards of $100,000, an overpayment they claimed resulted in lower commissions for Plaintiffs Mainzer and Frazier.   In reality, Defendants Lambard, Woodyard and Schultz had not overpaid shareholder doctors, but simply used this as an excuse to cover up the fact that they had skimmed large sums of money from Plaintiffs and shareholders.

30.     Defendants Lambard, Schultz, and Woodyard also told Plaintiffs that samples were "double billed," and collections were considerably lower than projected.  Upon information and

belief, defendants Lambard, Schultz, and Woodyard pocketed that extra revenue and the billing company billed those samples correctly.

31.     As another example of Defendants' misleading statements, Defendants Lambard and Schultz claimed samples from Arkansas and Missouri were collecting considerably lower rates than other regions. Defendants, Lambard, Schultz and Woodyard advised Plaintiffs Mainzer and Frazier to increase their volume to keep up with neighboring regions.  Upon information and belief, all samples were billed under the same fee schedule, which would collect the same amount of revenue despite the regions.

32.     As Defendants began to run out of excuses for the accounting discrepancies, Defendants Lambard and Schultz told Plaintiffs there was an additional 30% override to Munear Kouzabari deducted from Icon Labs 3, LLC's revenue before commissions were calculated. Munear Kouzabari owned Southwest Labs, LLC, a laboratory that Icon Labs 3, LLC worked with to process laboratory referrals.

33.     Plaintiffs Mainzer and Frazier had never been informed of this override to Southwest Labs, LLC by any Icon or Southwest employees.  Indeed, former COO of Icon Solutions, Aron Tipton, had never informed Plaintiffs, Mainzer or Frazier of the extra override to Munear Kouzabri and Southwest Labs, LLC.  This fact was certainly material to Plaintiffs' decision to enter the First Contract with Defendants.

34.     Plaintiffs would subsequently discover that Lambard, Schultz, and Woodyard fabricated this story to deceive Plaintiffs and shareholders, and deliberately deceived Plaintiffs about the potential income from future commissions before the contractual agreement was even signed. Lambard, Schultz, and Woodyard deliberately deceived shareholders with these actions to skim funds for themselves.

35.     In April of 2016, Defendants Lambard and Schultz breached the First Contract by paying Plaintiffs less in commissions than they were due.  Defendants Lambard, Schultz, and Woodyard justified the shortfall by claiming that "cost of goods" included Munear Kouzabari's 30% override. However, the contract clearly established a formula for compensation, which did not indicate the 30% override.

36.     Plaintiffs confronted the defendants about the breach. After confrontation, Defendants Lambard and Schultz agreed to pay Plaintiffs correctly the following month.  But this never happened.

37.     Defendant Lambard told Plaintiffs he was broke and could not afford to pay the extra monies that month. Defendants continued to breach the First Contract and refused to pay the full amount due to Plaintiffs under the contract.

38.     Defendant Lambard vehemently protested that he could no longer afford to pay Plaintiffs without the 30% override included.  Defendants Lambard, Schultz and Woodyard stated Aron Tipton had overpaid the investor physicians so significantly that it had put strain on the company, so commissions had to be changed.  Therefore, in June of 2016, Plaintiffs and Defendants agreed to move forward with a 50/50 split of revenue generated by shareholders only.

39.     In August 1, 2016, after dissolving Platinum Rule Medical Consultants, LLC, Plaintiff Mainzer signed an updated Contractor Agreement with Defendant Icon Solutions, LLC, and its subsidiaries to sell and promote the services and products of Defendant (hereinafter referred to as "Second Contract"). A copy of this contract is attached as Exhibit "B". Plaintiffs Mainzer and Frazier decided to work together under a new business relationship, and together they formed Progressive Medical Consultants, LLC.  Plaintiff Mainzer subsequently assigned all rights and obligations of the Second Contract to Progressive Medical Consultants, LLC.

40.     The Second Contract was for a term of one year, and stated that the total gross revenue of the lab would to be distributed as follows:

    a)  30 cents of every dollar were paid to owners of Southwest Labs, LLC for cost of goods;

    b)  21 cents of every dollar were paid to Munear Kouzbari (owner of Southwest Labs, LLC) for owning and running all the testing facilities;

    c)  19.6 cents of every dollar were to be divided among the doctor investors;

    d)  14.7 cents of every dollar were to be distributed to Defendants;

    e)  14.7 cents of every dollar were to be distributed to Plaintiffs.

41.     The contract further stated that Defendants would provide monthly and quarterly reports to Plaintiffs on the details related to genetic, blood, and urine toxicology screens provided by Customers referred by Plaintiffs, as well as the following other duties specifically identified:

> **5. Duties of the Company. The Company Agrees to:**
>
> **A.** Pay commissions to the Contractor once per month, on or before the 28th (twenty eighth) business day of the month following the month in which Company receives commissions for approved orders as per section 10.
>
> **B.** Commissions on refunds to customers or merchandise returned by the customer in which a commission has already been paid to the Contractor shall be deducted from future commissions to be paid to the Contractor by the Company.
>
> **C.** The following shall not be commissioned:
>
> a. Freight Charges/Shipping Fees, returns, claims, discounts, marketing materials, PPM, signature packets and allowances.
>
> **D.** To provide the Contractor with reasonable quantities of marketing materials, pricing information and sales aids at no cost.  Such items shall remain the property of the Company at all times, and Contractor shall return all such items to the Company promptly upon termination of this Agreement or earlier at Company's request.  Company will reimburse postage, shipping expenses, and materials needed to conduct business.
>
> **E.** To pay commissions to the Contractor for orders that are submitted to Company upon payment from customer per the guidelines established above in Section 10. Commission payments will continued to Contractor as long as payments are received by company regardless of Contractors status with company.
>
> **F.** The Company shall provide monthly and quarterly reports to CONTRACTOR that include full disclosure and all details disclosures related to all genetic, blood and urine toxicology screens that were provided by Customers referred by CONTRACTOR. The reports will include physician name, number of tests, and complete financial breakdowns, and contractor requests regarding commissions due the first of the month.  The billing and reimbursement numbers that correlate with the commissions paid and such other information from the company or requested by CONTRACTOR regarding their business  must by in writing 2 days in advance of the 28 (twenty eighth).  Company will communicate the check amount to contractor/shareholders 2 days in advance of the 28 (twenty eighth) of the month.\*

42.     The contract specifically stated that Defendants *"shall"* notify Plaintiffs in writing *via* email or letter for any suspicious or questionable activity and of any monthly expenses that exceeded 30% of the total gross revenue, as follows:

---

G. The Company shall notify CONTRACTOR in writing via email or letter within 48 hours of any suspicious or questionable activity specifically relating to distributions, expenses, Company resources, audits or fraudulent billing that is perpetrated by any entity directly or indirectly involved with the Company or Icon Labs 3, LLC.

H. The Company shall notify CONTRACTOR in writing via email or letter, including a reasonably detailed explanation, for any monthly expenses incurred that exceed 30% of total gross revenue for Icon Labs 3, LLC, regardless of whether the cause was directly or indirectly caused by the Company, Icon Labs 3 LLC, any subsidiary lab that processes Icon Labs 3, LLC toxicology, blood or genetic screens or any other person or entity.

This provision was critically important to Plaintiffs because any expenses exceeding 30% would significantly dilute Plaintiffs' share of the net profits, which they had experienced under the First Contract. Indeed, Defendants' own PPM stated gross expenses of 17%, and Plaintiffs' generously acquiesced to the 30%, recognizing it as a static cap on expenses unless otherwise reported.

43.     Additionally, the contract stated that Icon Solutions would follow all the guidelines set forth in the PPM signed by the shareholders (referring physicians). Specifically, Icon Solutions would provide annual unedited statements for the company, quarterly reports, and company activities to the shareholders.

44.     Nonetheless, distributions and commissions dropped significantly after the parties entered the Second Contract. Frustrated, Plaintiff Mainzer began frequently corresponding with Southwest Labs, LLC owner Munear Kouzabari, whom he had befriended at a meeting. In early August 2016, Plaintiff, Mainzer circumvented Icon and emailed Southwest Labs, Munear Kouzabari, and other directors directly to request accounting information.

45.     Defendants Lambard and Schultz intervened, stating all reports would need to go directly through them. Despite these objections, on August 10th, 2016, Plaintiffs, Mainzer and Frazier received their first commission report directly from Munear Kouzabari of Southwest Labs, LLC. The report showed revenue ten (10) times greater than the reports from previous months Defendants had provided to Plaintiffs.

46.     Upon information and belief, Defendants, Lambard and Schultz would directly receive reports from Southwest Labs, LLC or subsidiaries, and would then cook the books and pass the doctored report to the Plaintiffs.

47.     At the end of September 2016, Plaintiffs, Mainzer and Frazier received a "final report" that supposedly displayed billing from Plaintiffs' samples. The final report Defendants sent contained numerous errors, billing omissions, and suspicious color coding. The report also contained over 600 blood wellness tests from Plaintiffs accounts. Plaintiffs were disturbed at the average reimbursement was just over $75.00 per sample.  Plaintiff knew from experience in the industry that reimbursement of blood wellness tests billed through hospital contracts typically averaged upwards of $2,000 per sample.  Upon information and belief, Defendants Lambard, Schultz, and Woodyard, provided false documents to Plaintiffs to cover up their misappropriation of funds.

48.     Plaintiffs began questioning these reports, and Defendants would deny wrongdoing and shift the blame to Munear Kouzabari. Defendants frequently stated he was a thief, owed significant outstanding debts to numerous vendors, and was being pursued by lawsuits with other distributors. Defendants suggested that Plaintiffs needed to move their business as soon as possible to Mission Labs in San Antonio, Texas.

49.     In December 2016, Munear Kouzabari contacted Plaintiff Mainzer to talk about Southwest Labs, LLC's financial burdens. Kouzabari told Plaintiff Mainzer he never received a 30% override after cost of goods sold from Icon.  Plaintiffs confronted Defendants with this allegation. Defendants Schultz and Lambard denied Munear Kouzbari's claim.  Plaintiffs feared for their reputations and potential backlash from their clients and shareholders.  Therefore, Plaintiffs moved most of their business and terminated their agreement with Defendants.

50.     Defendants, Lambard and Schultz were infuriated by Plaintiffs decision to leave Icon Labs 3, LLC, refused to pay Plaintiffs rightfully earned commissions.

51.     In sum, Plaintiffs performed sales work pursuant to the First and Second Contract for a significant period while trying to remedy what appeared to be accounting discrepancies. Plaintiffs' distributions seemed remarkably low considering the revenues that should have been generated from the volume of sales Plaintiffs had produced.  Plaintiffs made inquiries to various parties within the team and discovered Plaintiffs were only receiving a fraction of the distributions they should have been receiving from the gross profits.  Plaintiffs approached Defendants, who denied retaining any of the profits Defendants should have paid to Plaintiffs, and claimed, *inter alia*, that expenses had been more than expected.  This excuse was not justified under the contract because Defendants' expenses were capped at 30% - they could claim no more than that unless they provided a detailed explanation for the excess incurrence.  Defendants never provided Plaintiffs a detailed written explanation of expenses, except for a brief few months of 35% towards the end of their relationship with Southwest Labs, LLC. Therefore, any expenses Defendants incurred over 30% should have deducted from Defendants' profits, rather than those of Plaintiffs' and the physicians.

52.     Additionally, Plaintiffs discovered Defendants lied about the need to pay Munear Kouzabari, as a separate line item after deducting Defendant Icon Labs 3, LLC's operating expenses under the Second Contract.  Defendants had induced Plaintiffs to enter the Second Contract by claiming that this added expense was a necessity.  But, Plaintiffs ultimately discovered this was a fabrication, and Munear was not receiving his percentage of the revenues.  Instead, his distribution was baked into the 30% overhead Icon was retaining, and not paid to Munear as an independent expense.  Therefore, Defendants were simply lining their own pockets by lying about

paying Munear and having to cover unforeseen expenses.  Indeed, Defendants' own internal documents show Defendant was funneling large sums of money – part of which was owed to Plaintiffs – to a third-party entity created by Defendant David Schultz.

53.     On information and belief, Defendants had no intention of performing under the contract from the beginning, and, therefore, fraudulently induced Plaintiffs into entering into a distribution agreement with promise of lucrative commissions.  But, Plaintiffs only received a fraction of what was owed to them while Defendants lined their pockets under the guise of unforeseen expenses which were never disclosed in detail to Plaintiffs.

**IX.**
**CAUSES OF ACTION**

**COUNT ONE: BREACH OF CONTRACT**
**ICON LABS, LLC, ICON SOLUTIONS, LLC AND ICON LABS 3, LLC**

54.     On or around June 2015, Plaintiffs Mainzer, executed valid, enforceable contracts entitled "Contractor Agreement" (the "First Contract"). A true and correct copy of the Contract is attached hereto as **Exhibit "A"** and incorporated herein by reference.

55.     Pursuant to the terms of the First Contract, Plaintiff was to receive a percentage range of the gross revenues of Icon Labs in exchange for Plaintiffs distributing goods and services of the lab.

56.     Plaintiff fully performed all contractual obligations that became due and tendered performance of those obligations that had not yet become due.  Pleading in the alternative, if necessary, and without waiving any allegations, claims, defenses, or theories of liability pleaded herein, Plaintiff was excused from performing its remaining contractual obligations because Defendants materially breached the First Contract as set forth herein.

57.     Defendants breached the First Contract by, *inter alia*, failing and refusing to pay Plaintiffs as promised.

58.     On or around August 1, 2016, Plaintiffs, as Contractors, and Defendant Icon Solutions, as Company, executed valid, enforceable contracts entitled "Contractor Agreement" (the "Second Contract"). A true and correct copy of the Contract is attached hereto as **Exhibit "B"** and incorporated herein by reference.

59.     Pursuant to the terms of the Second Contract, Plaintiffs were to have received 14.7% of the gross revenues of Icon Lab in exchange for Plaintiffs distributing goods and services of the lab.

60.     Plaintiffs fully performed all contractual obligations that became due and tendered performance of those obligations that had not yet become due.  Pleading in the alternative, if necessary, and without waiving any allegations, claims, defenses, or theories of liability pleaded herein, Plaintiffs were excused from performing its remaining contractual obligations because Defendants materially breached the Second Contract as set forth herein.

61.     Defendants breached the Second Contract by, *inter alia*, failing and refusing to pay Plaintiffs as promised.

62.     Defendants also breached the Second Contract by failing to provide Plaintiffs a detailed explanation for any monthly expenses that exceeded 30% of total gross revenue for Icon Labs 3 LLC.

63.     The breaches were material because payment of commissions to Plaintiffs was the very essence of the Second Contract. Defendants' breaches, therefore, deprived Plaintiffs of the benefits they reasonably expected and relied upon in performing its obligations under the Contract.

64.    Defendants' breaches caused injury to Plaintiffs, which resulted in direct and circumstantial damages as follows:

a.  **Plaintiffs' Damages**

65.    <u>Out of Pocket Expenses</u>.  In reliance on Defendants' promise to perform under the contract, Plaintiffs expended personal funds on attorney's fees, and other due diligence items to ensure they could meet their own obligations.  If Plaintiffs had known Defendants did not intend to perform their contractual obligations they would not have made these expenditures.  Nor would Plaintiffs have entered into the Contract.

66.    <u>Lost Profits</u>.  Plaintiffs suffered loss of past and future profits including, but not limited to, millions of dollars in sales commissions Defendant should have paid Plaintiffs under the terms of the contract, but chose to keep for themselves.

67.    <u>Damages</u>.  Plaintiffs seek no less than $3,000,000 in unliquidated damages within the jurisdictional limits of this Court.

68.    <u>Attorney Fees</u>.  Plaintiffs are entitled, and therefore seek, to recover reasonable and necessary attorney fees under Sections 38.001 *et seq*. of the TEXAS CIVIL PRACTICE AND REMEDIES CODE.

### COUNT TWO: COMMON-LAW FRAUD
### DEFENDANTS LAMBARD, TIPTON, AND SCHULTZ

69.    Plaintiffs repeat and incorporate by reference the paragraphs above and herein.

70.    Defendants defrauded Plaintiffs by means of fraudulent misrepresentations, fraudulent inducement, fraud by nondisclosure, and fraudulent concealment.

71.    Before and after entering into the Second Contract, Defendants represented to Plaintiffs that they would receive 50% of the profits Icon Solutions earned from Plaintiffs' sales efforts.

72.     This representation was false because Defendants intended to retain a significantly larger percentage of the profits.  Furthermore, Defendants represented they had an obligation to pay Munear Kouzabari in addition to the 30% they retained as expenses.  This was not true – the cost of Munear Kouzabari's services was subsumed in the 30% Icon Labs 3 LLC's expenses, and was not paid out to Mr. Kouzabari as a separate line item in the budget. Had Plaintiffs known this fact, they never would have entered into the contract.

73.     Furthermore, Defendants repeatedly falsely represented that expenses were higher than expected to justify the lower-than-expected distributions to Plaintiffs.  Defendants made these representations in hopes that Plaintiffs would not continue to question why net profits were far lower than projected, while they continued to direct payments to themselves.

74.     The false statements of fact and false promises were material because Defendants had no intention of paying Plaintiffs pursuant to the terms of the contract.

75.     At the time they made the representation, Defendants knew that such representations were false and/or made the representations recklessly, without any regard for their truth, with the intent that Plaintiffs would rely on the representation.

76.     Plaintiffs reasonably believed and did in fact rely on these representations and, as a result, Plaintiffs were induced to enter into the Contract, as well as continue to perform under the contract.

77.     As a direct and proximate result of such actions, Plaintiffs sustained actual damages including, but not limited to, lost profits, out-of-pocket expenses, and lost benefits and business opportunities in an amount within the jurisdictional limits of this court.

78.     The acts described above constitute "actual fraud" in that Defendants made a false, material misrepresentation that they either knew to be false or asserted recklessly without

knowledge of its truth, with the intent that Plaintiffs would act on the misrepresentation. Plaintiffs did indeed act in reliance on the misrepresentation, and have been injured as a result. Accordingly, Plaintiffs seek exemplary damages under Sections 41.001 et seq. of the TEXAS CIVIL PRACTICE AND REMEDIES CODE.

## COUNT THREE: MONEY HAD AND RECEIVED
## ALL DEFENDANTS

79. Pleading in the alternative, if necessary, and without waiving any claims, causes of action, allegations or theories of liability, and while incorporating by reference the factual allegations stated herein, Plaintiffs allege a cause of action against Defendant for "money had and received."

80. Defendants hold funds in the form of commissions which in equity and good conscience belong to Plaintiffs. Therefore, Plaintiffs are entitled to recover from Defendants the sum of no less than $3,000,000 plus attorney's fees. *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 507 (Tex. App.—Fort Worth 2012, no pet.).

## COUNT FOUR: THEFT OF PROPERTY
## ALL DEFENDANTS

81. Pleading in the alternative, if necessary, and without waiving any claims, causes of action, allegations or theories of liability, and while incorporating by reference the factual allegations stated herein, Plaintiffs allege a cause of action under the TEXAS THEFT LIABILITY ACT for an unlawful appropriation of property under TEXAS PENAL CODE § 31.03.

82. Defendants unlawfully appropriated Plaintiffs' commissions in violation of TEXAS PENAL CODE § 31.03(b)(1).

83. Their unlawful appropriation was made with the intent to deprive Plaintiffs of the property.

84.     Their wrongful conduct caused injury to Plaintiffs, which resulted in the loss of no less than $3,000,000, among other damages.

85.     Upon proof of actual damages, Plaintiffs are entitled to additional statutory damages of $1,000 from Defendants under TEXAS CIVIL PRACTICE & REMEDIES CODE § 134.005(a)(1).

86.     Plaintiffs seek unliquidated damages within the jurisdictional limits of this court.

87.     Plaintiffs further seek exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE § 41.003(a) because Plaintiffs' injury resulted from malice or actual fraud.

88.     Additionally, Plaintiffs are entitled, and therefore seek, to recover reasonable and necessary attorney fees and costs, pursuant to Section 134.005(b) of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

## COUNT FIVE: UNJUST ENRICHMENT
## ALL DEFENDANTS

89.     Pleading in the alternative, if necessary, and without waiving the above allegations and while incorporating by reference the factual allegations stated herein, Plaintiffs allege that Defendants were unjustly enriched in that they wrongfully secured a benefit or passively received one which it would be unconscionable to retain.  Further, they obtained a benefit from Plaintiffs by fraud, duress, or the taking of an undue advantage; and as a result of an "opportunistic breach" of the Contract.  RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 39 (2011).

90.     Plaintiffs are entitled to, and therefore seek, disgorgement of all benefits wrongfully obtained by Defendants resulting in their unjust enrichment, including, without limitation, the all past and future commissions due and owing under the Contract.

## COUNT SIX: QUANTUM MERUIT

91.     Pleading in the alternative, if necessary, and without waiving the above allegations

and while incorporating by reference the factual allegations stated herein, Plaintiffs allege that they provided valuable contracted services for Defendants by distributing its products to investor physicians.  These services were provided exclusively for Defendants.  Defendants accepted all the benefits of Plaintiffs' services and retained substantial amount of funds that rightfully belong to Plaintiffs under the terms of the parties' contract.  Defendants had reasonable notice that Plaintiffs expected compensation for the services because the parties' contract provided for Plaintiffs' compensation.

92.     Plaintiffs are entitled to, and therefore seek, all past and future commissions due and owing under the Contract, as well as prejudgment and post-judgment interest, and attorneys' fees.

## X.
## EXEMPLARY DAMAGES

93.     Pleading in the alternative and without waiving the above allegations and while incorporating by reference the factual allegations stated herein, Plaintiffs seek exemplary damages on the following grounds:

**A.  Breach of the Duty of Good Faith and Fair Dealing, Malice, and Fraud**

94.     Defendants' breaches of the duties of good faith and fair dealing were aggravated by the kind of malice, fraud, and gross negligence for which the law, including but not limited to Chapter 41 of the TEXAS CIVIL PRACTICES AND REMEDIES CODE, allows the imposition of exemplary damages.

95.     Defendants' actions were specifically intended to cause substantial injury and harm to Plaintiffs.

96.     Defendants' breaches of the duty of good faith and fair dealing, when viewed objectively from Defendants' standpoint at the time of the breaches, involved an extreme degree

of risk, considering the probability and magnitude of the potential harm to Plaintiffs, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights and welfare of Plaintiffs.

### B.     Criminal and/or Quasi-Criminal Conduct

97.     In the alternative and without waiving any of the foregoing, Plaintiffs would show that by engaging in the conduct alleged herein, Defendants knowingly and/or intentionally violated TEX. PENAL CODE § 32.46 (Securing Execution of Document by Deception) and TEX. PENAL CODE § 31.03 (Theft).  Therefore, Plaintiffs are entitled to recover exemplary damages in an amount not less than that which will make Plaintiffs whole.

## XI.
## PIERCING THE CORPORATE VEIL

98.     Plaintiffs repeat and incorporate by reference the paragraphs above and herein.

### A.     Icon Solutions

99.     Plaintiffs are entitled, and seek, to pierce the corporate veils of Icon Solutions, LLC Icon Labs, LLC, and Icon Labs 3, LLC,  and hold their principals, William Wesley Lambard and Aron Tipton, each personally liable for the damages suffered by Plaintiffs as a result of their wrongful conduct committed while acting on behalf of those entities.

100.     At all relevant times, Icon Solutions, Icon Labs, and Icon Labs 3 were organized and operated as a mere tool or business conduit of William Wesley Lambard and Aron Tipton. Furthermore, such entities were run by and for the personal benefit of William Wesley Lambard and Aron Tipton and are the agents and instrumentalities through which they conducted business. Therefore, these entities were nothing more than alter egos of William Wesley Lombard and Aron Tipton  and/or were used by these Defendants as part of a sham to perpetrate a fraud on Plaintiffs.

**B.      David Schultz, LLC**

101.     Plaintiffs are entitled, and seek, to pierce the corporate veils of David Schultz, LLC, and hold their principal, David Schultz personally liable for the damages suffered by Plaintiffs as a result of his wrongful conduct committed while acting on behalf of those entities.

102.     At all relevant times, David Schultz, LLC was organized and operated as a mere tool or business conduit of David Schultz.  Furthermore, this entity was run by and for the personal benefit of David Schultz and is the agent and instrumentality through which he conducted business. Therefore, this entity was nothing more than the alter ego of David Schultz and/or was used by David Schultz as part of a sham to perpetrate a fraud on Plaintiffs.

## XII.
## COSTS AND ATTORNEYS' FEES

103.     Plaintiffs are entitled, and seek, to recover their costs and reasonable attorneys' fees expended in the prosecution of this action pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001 since this is a suit based on both oral and written contracts.

104.     Under principles of equity, part of Plaintiffs' actual damages from the Defendants' actions and inactions described herein are measured by the attorneys' fees Plaintiffs were forced to expend. As a consequence of the wrongful acts of Defendants, Plaintiffs were forced to incur reasonable and necessary costs and attorneys' fees in defense and prosecution of same and are entitled to the recovery of same as actual damages.

105.     Defendants have not presented a settlement offer to Plaintiffs. In the event of appeals to the Court of Appeals and the Supreme Court, respectively, Plaintiffs will also incur additional reasonable and necessary attorneys' fees and costs of Court in the prosecution thereof.

## XIII.
## DEMAND FOR PRESERVATION OF EVIDENCE

106.    Plaintiffs hereby request and demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the transactions made the basis of this lawsuit, or damages resulting therefrom, including statements, photographs, videotapes, surveillance tapes, audiotapes, business records, partnership or corporate records, audits, regulatory records or communications, contracts, leases, bills, estimates, invoices, checks, correspondence, investigation reports, policies, protocols, personal information, memoranda, facsimiles, email, cellular telephone records, voice mail, text messages, and any electronic image or information related to the referenced transactions or any damages resulting therefrom. Failure to maintain such items constitutes "spoliation" of the evidence.

## XIV.
## DEMAND FOR JURY TRIAL

107.    Plaintiffs demand a trial by jury on all issues so triable and, submitted jointly with this Original Complaint, tender the appropriate fee for jury trial.

## XV.
## CONDITIONS PRECEDENT

108.    All conditions precedent have been performed or have occurred pursuant to the FEDERAL RULES OF CIVIL PROCEDURE.

## XVI.
## PRAYER

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment for Plaintiffs and against the Defendants cited herein as follows:

109.    Enter judgment for Plaintiffs against all Defendants, jointly and severally, awarding actual damages, compensatory damages, and economic damages, including, but not limited to, out

of pocket damages, lost profits damages, direct, consequential and incidental damages, and any other monetary relief to which Plaintiffs are entitled under the law as a result of the wrongful conduct of Defendants as alleged herein; and

110.    Enter judgment for Plaintiffs against Defendants jointly and severally, disgorging all benefits obtained resulting in their unjust enrichment and compelling payment of same to Plaintiffs;

111.    Enter judgment for Plaintiffs against all Defendants, jointly and severally, awarding exemplary, punitive, statutory and/or treble damages as alleged herein;

112.    Enter judgment for Plaintiffs against all Defendants, jointly and severally, awarding monetary relief in an amount equal to Plaintiffs' attorneys' fees;

113.    Enter judgment for Plaintiffs against all Defendants, jointly and severally, awarding relief in an amount equal to Plaintiffs' costs and expenses;

114.    Enter judgment for Plaintiffs against all Defendants awarding prejudgment and post-judgment interest under Common Law;

115.    Grant to Plaintiffs such other and further relief as may be just and appropriate to correct the wrongs done unto Plaintiffs by Defendants.

Respectfully submitted,

**HUGHES ELLZEY, LLP**


  _/s/  Jarrett L. Ellzey_
W. Craft Hughes
Texas Bar No. 24046123
craft@hughesellzey.com
Jarrett L. Ellzey
Texas Bar No. 24040864
jarrett@hughesellzey.com
Galleria Tower I
2700 Post Oak, Blvd, Suite 1120
Houston, TX 77056
Telephone (713) 554-2377
Facsimile (888) 995-3335


*David G. Nixon
Arkansas Bar No. 88048
david@nixonlaw.com
The Nixon Law Firm
4100 Wagon Wheel Road
Springdale, AR 72762
Telephone (479) 582-0020
Facsimile (479) 582-0030

*(Pro hac vice admission will be requested)